

IN THE

# Court of Appeals of Indiana

Barry Dircks,

*Appellant-Plaintiff*

v.

Joseph Delamater and Razumich & Delamater, P.C.,

*Appellees-Defendants*



FILED
Jun 30 2026, 9:07 am
CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

June 30, 2026

Court of Appeals Case No.
25A-CT-932

Appeal from the Marion Superior Court

The Honorable Timothy W. Oakes, Judge

Trial Court Cause No.
49D02-2204-CT-11758

**Opinion by Chief Judge Tavitas**
Judge Bailey concurs.
Judge Kenworthy dissents with separate opinion.

**Tavitas, Chief Judge.**

## Case Summary

[1] Attorney Joseph Delamater, then of the law firm Razumich & Delamater, P.C. ("the Firm"), voluntarily intervened on behalf of Barry Dircks when Dircks was involved in an approximately ten-hour standoff with law enforcement. With Delamater's help, the standoff was resolved peacefully. Delamater did not appear on Dircks' behalf at a subsequent child in need of services ("CHINS") detention hearing, and Dircks' children were temporarily removed from his custody. Dircks later brought a legal malpractice claim against Delamater and the Firm (collectively, "Defendants"). After each party moved for summary judgment, the trial court granted summary judgment in favor of Defendants. Dircks appeals and argues that genuine issues of material fact preclude the entry of summary judgment. We disagree and, accordingly, affirm.

## Issue

[2] Dircks presents one issue, which we restate as whether the trial court erred by granting summary judgment in favor of Defendants.

## Facts

[3] On the morning of March 4, 2019, the Department of Child Services ("DCS") received a report of potential neglect involving Dircks' two children, then four years old and one year old. The source informed DCS of the following allegations: a family member brought Dircks' wife and the children's mother, Kathryn, to the hospital around 3:00 a.m. Kathryn "had not eaten, drank [sic],

or slept for three days," and she was "paranoid" and "aggressive." Appellant's App. Vol. II p. 35. Someone from the hospital contacted Dircks around 6:00 a.m. He stated he was at the family's home in Lebanon with the children. The source had no knowledge of imminent danger, injury, or threats to the children, but reported that Dircks was "very protective" of them. *Id.* Dircks was described as "very paranoid" and "delusional" and stated his in-laws sent the military and government after his family; there was "small artillery" in the home; the family did not sleep unless two people were guarding the home with rifles; he barricaded the doors whenever anyone knocked; and he believed that Kathryn was "possessed." *Id.*

[4] Based on this report, DCS sent caseworkers to Dircks' home to check on the children's welfare, accompanied by deputies from the Boone County Sheriff's Office ("BCSO"). After the deputies approached and knocked on the door, Dircks denied them entry to the home due to the lack of a warrant.

[5] The situation escalated from there. BCSO set up a command center near the property line and activated the Special Response Team and Crisis Negotiation Team. BCSO attempted to contact Dircks and other family members by phone. In addition to Dircks and the children, Dircks' adult brother and sister were inside the house. Dircks' mother, Shirley, was also en route to Indiana from Utah.

[6] Around 1:45 p.m. that afternoon, DCS filed a motion in the Boone Circuit Court to compel the Dirckses to allow DCS to interview the children and observe the home environment. Shortly thereafter, that court ordered the

Dirckses "to allow the [BCSO] and [DCS] Family Case Managers to enter the home and the property . . . to determine the welfare and safety of all individuals, including all children in the home," and "to produce [the children] for interview." *Id.* at 106.

[7] Meanwhile, Dircks attempted to reach an attorney to assist him. He called an attorney with whom Kathryn had worked and left a voicemail with the office. That attorney contacted Delamater, who agreed to call Dircks. Delamater and Dircks spoke on the phone around 4:20 p.m. What occurred during this call is disputed, but Delamater called dispatch and told them he was an attorney trying to get information about his client. Delamater explained he was not sure if his client had "a mental break" or if a SWAT team was at the client's house. Appellant's Supp. App., Ex. 35 at 1:48. Dispatch confirmed that multiple officers were near Dircks' property and took Delamater's phone number to pass on to BCSO.

[8] Boone County Sheriff Michael Nielsen called Delamater. Delamater explained that he was trying to figure out "what's actually happening." *Id.*, Ex. 3 at 0:48. Delamater stated that he did not believe DCS would "find anything amiss with the home" but he was concerned for his "client's state of mind." *Id.* at 5:10-5:22. Sheriff Nielsen wanted to "work out a surrender plan" for everyone to come out of the house so DCS could complete the welfare check. *Id.* at 8:05. Delamater said he would speak to Dircks.

[9] In a call about forty minutes later, Sheriff Nielsen explained to Delamater BCSO's plan to have Dircks' sister bring the children out of the home to an

armored personnel carrier and for DCS to take custody of them. Delamater stated that Dircks was agreeable to BCSO and DCS coming onto the property to do a welfare check. Sheriff Nielsen responded that DCS had decided to detain the children "because of the seriousness of the situation for now." *Id.* at 3:38:26. DCS confirmed that it planned to open a CHINS case and indicated that the children would not be permitted to stay in the home that night.

[10] Thereafter, BCSO and DCS developed a plan for Dircks to surrender the children and for DCS to place them overnight in the home of Benjamin and Allison Crockett, who knew the Dirckses through church. The Crocketts agreed that the children's grandmother, Shirley, who had since landed in Indianapolis and been picked up at the airport by BCSO, could stay at their home with the children. Delamater agreed to present the plan to Dircks and try to persuade Dircks to follow it.

[11] At approximately 7:00 p.m., Dircks sent the children out of the home without incident, and DCS detained the children on an emergency basis. Neither BCSO nor DCS went into the home that evening; according to DCS, Dircks directed all further communications to his attorney.

[12] The day after the standoff, DCS requested authorization to file petitions alleging that the children were CHINS. That day, Delamater left Dircks a voicemail stating that DCS told Delamater there was a court hearing scheduled for the next morning, March 6, but Delamater would not be able to attend due to a prior commitment. Delamater advised Dircks to attend, tell the court he was hiring counsel, and request another hearing date "so that I can appear with

you," and "just kinda go from there." *Id.*, Ex. 12 at 0:23. Delamater also advised Dircks that, when he called the Firm back, Dircks should speak to his assistant to set up an appointment with Delamater to go over paperwork. At some point that day, the assistant left a voicemail for Dircks to set up a phone appointment with Delamater.

[13] The trial court held the initial and detention hearings on the morning of March 6, 2019. Dircks and Shirley attended; Delamater, as he had informed Dircks, did not. At the outset, Dircks informed the court that he had an attorney who could not attend due to a prior commitment. The trial court asked, "Who is your attorney sir?" and Dircks responded, "Uh, Joe Delm – Delamante – Delamonte [phonic]." Appellant's App. Vol. II p. 164 (brackets in original). The trial court noted that any attorney would need to file an appearance, but it would set a status review hearing for the next week so that an attorney could attend.

[14] The trial court advised Dircks of his rights and entered a preliminary denial of the CHINS petitions. In the detention phase, the trial court authorized the detention based on the testimony of a DCS supervisor. After a discussion with Dircks and Shirley, the trial court ordered the children placed with Shirley at the Crocketts' house, subject to Shirley's completion of a background check and drug test. As to visitation, the trial court explained:

> The Court: Now, visitation with father. [] DCS is asking for that
> to be supervised . . . by [a] provider[.] [W]e may get to that point
> where we have to do it but . . . you wouldn't even be able to get
> that done this week. If you sir [] and the Crockets [sic] are

agreeable, if you want to go over there and see your kids a couple
of times and including –

Mr. Dircks:  Thank you.

The Court:  today.

Mr. Dircks:  Thank you.  I can go over after this?

The Court:  Yes.

*Id.* at 191.  The trial court later stated:

> The Court: . . . I'm not going to enter any orders ordering you to
> [get a mental health evaluation] right now.  The only order is that
> you – you can have visitation with the kids this week *with
> grandmother there* at the Crockets [sic] home. . . .

*Id.* at 193 (emphasis added).  The trial court then set a review hearing for March
14, 2019.

[15]  After the hearing, Shirley went with DCS officials to complete a background
check and drug test.  Dircks went to the Crocketts' home to visit the children
even though Shirley was not present.  The DCS local office supervisor advised
the court via email that Dircks was at the Crocketts' home without Shirley
being present.  That afternoon, the court held an emergency hearing.  Because
Dircks violated the order by visiting the children outside of Shirley's presence,
the court ordered the children to be placed in foster care and Dircks' visitation
to be fully supervised.

[16]  According to Dircks, he called Delamater after the hearing and fired him.
Dircks hired another firm to represent him, and that firm entered an appearance

in the CHINS case on March 7, 2019. Dircks underwent a psychological evaluation on March 11, and the psychologist concluded that Dircks "does not present as a threat to himself or others and is fully capable of raising his children without outside intervention." *Id.* at 82. DCS completed a home inspection on March 12, 2019. The children remained in foster care until the March 14 hearing, after which they returned to the Dirckses' home. About a month later, the court dismissed the CHINS petitions on DCS's motion.

[17] In October 2019, Dircks requested his client file from Delamater. Delamater responded that there was no file because they spoke only on the phone on an "emergency basis" and "[t]hat night we determined I couldn't help you past that evening due to your desire to sue the county." *Id.* at 84. In December 2019, the Dirckses filed a twenty-eight-count complaint in federal court against 107 defendants—nearly every party involved in the March 4 standoff. The complaint included a legal malpractice claim against Delamater. The federal court declined to exercise supplemental jurisdiction over the claim and dismissed it without prejudice in 2022.

[18] On April 11, 2022, Dircks, pro se, filed a single-count legal malpractice claim against Defendants, alleging:

> 18. As [Dircks'] attorneys, the Defendants failed to exercise ordinary skill and knowledge required of an attorney licensed to practice in the State of Indiana.
>
> 19. The Defendants' failure to exercise ordinary skill and knowledge of an attorney includes but is not limited to: failure to conduct a careful and timely investigation into the facts and

circumstances of the JM and CHINS cases, failure to procure witnesses to testify in the CHINS initial/detention hearing, failure to attend the CHINS initial/detention hearing, failure to diligently and promptly advocate on [Dircks'] behalf, and failure to inform [Dircks] of his rights.

20. As a direct and proximate result of one or more of the aforesaid acts, [Dircks] has suffered and continues to suffer damages.

Appellant's App. Vol. II p. 25.

[19] On January 20, 2024, Defendants moved for summary judgment, arguing that no attorney-client relationship had been formed between the parties, and even if it had, there was "no evidence to establish the duty, breach, and causation elements required for a viable legal malpractice claim[.]" Appellant's App. Vol. IV p. 73. Defendants designated fifteen exhibits, including Delamater's affidavit stating he did not believe that he was in an attorney-client relationship with Dircks. Defendants also designated the expert opinion of attorney Shelley Haymaker that no attorney-client relationship existed between Delamater and Dircks, but even if it did, Delamater neither breached his duty nor was any alleged breach the proximate cause of Dircks' damages.

[20] In November 2024, Dircks filed his response in opposition to Defendants' motion and a cross-motion for summary judgment. In support, he designated evidence, including his own affidavit averring that: Delamater agreed to be his attorney on March 4; he told Delamater that law enforcement and DCS could come into his home; and he relied on Delamater's advice when he agreed to send the children out. Dircks also designated the expert opinion of attorney

Dorothy Ferguson that an implied attorney-client relationship arose from the circumstances and that Delamater breached his duty by failing to adhere to the standards of practice for attorneys representing parents in abuse and neglect cases. Ferguson later supplemented her opinion, stating that Delamater was the proximate cause of the children's removal.

On February 3, 2025, the trial court denied Dircks' motion for summary judgment and granted Defendants' motion. Dircks then filed a motion to correct error, which the trial court denied. Dircks now appeals.

## Discussion and Decision

### I. Summary Judgment Standard of Review

Dircks appeals the trial court's entry of summary judgment in favor of Defendants.[1] "We review summary judgment decisions de novo, and Trial Rule 56(C) supplies the framework." *Cave Quarries, Inc. v. Warex LLC*, 240 N.E.3d 681, 684 (Ind. 2024). "The moving party is entitled to summary judgment only if the evidence it designates in support of its motion 'shows that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" *Id*. at 684-85 (quoting Ind. Trial Rule 56(C)). The purpose of summary judgment is to withdraw issues from the jury only when there are no genuine material factual issues for the jury to

---

[1] Technically, Dircks appeals the trial court's denial of his motion to correct error, in which he alleged that the trial court erred by granting Defendants' motion for summary judgment. In this procedural posture, we apply the standard of review appropriate for reviewing a trial court's summary judgment decision. *See, e.g., Poiry v. City of New Haven*, 113 N.E.3d 1236, 1239 (Ind. Ct. App. 2018).

decide. *Id.* at 685. "Summary judgment is available when the nonmovant cannot prove its claim based on the undisputed evidence[.]" *Id.*

[23] The summary judgment movant has the burden of making a prima facie showing that there is no genuine issue of material fact and that he or she is entitled to judgment as a matter of law. *Burton v. Benner*, 140 N.E.3d 848, 851 (Ind. 2020). The burden then shifts to the non-moving party, who must then show the existence of a genuine issue of material fact. *Id.* On appellate review, we resolve "[a]ny doubt as to any facts or inferences to be drawn therefrom . . . in favor of the non-moving party." *Id.* "We limit our review to the materials designated at the trial level." *Gunderson v. State, Ind. Dep't of Nat. Res.*, 90 N.E.3d 1171, 1175 (Ind. 2018).

## II. The trial court properly granted summary judgment in favor of Defendants.

[24] Dircks' sole claim against Defendants is for legal malpractice. The elements of an action for legal malpractice include: (1) employment of an attorney, which creates a duty to the client; (2) failure of the attorney to exercise ordinary skill and knowledge, which constitutes a breach of the duty; and (3) such negligence was the proximate cause of (4) damage to the plaintiff. *Reiswerg v. Statom*, 926 N.E.2d 26, 30 (Ind. 2010). "A defendant is entitled to summary judgment when the undisputed material facts negate at least one element of the plaintiff's malpractice claim." *Shorewood Forest Utils., Inc. v. Welsh*, 237 N.E.3d 1142, 1147 (Ind. Ct. App. 2024).

### A. The designated evidence shows that there was no continuing attorney-client relationship.

Dircks claims that an attorney-client relationship began on March 4, when Delamater first called him during the standoff, and continued through at least March 6, the date of the detention hearing. Delamater claims that, if any attorney-client relationship existed at all, it existed only during the March 4 standoff. We agree with Delamater.

It is undisputed that the parties never executed a written contract for services, and no fee was charged or paid. But this is not dispositive as to whether an attorney-client relationship existed because the creation of such a relationship does not depend upon the formal signing of an engagement agreement or upon the payment of attorney fees. *In re Anonymous*, 655 N.E.2d 67, 70 (Ind. 1995). An attorney-client relationship need not be express and may be implied by the conduct of the parties. *In re Kinney*, 670 N.E.2d 1294, 1297 (Ind. 1996). "The relationship is consensual, existing only after *both* attorney and client have consented to its formation." *Id*. (emphasis added). The relationship's "existence is dependent only on the nature of the interaction between the parties and their consent, express or implied, to such a relationship." *Anonymous*, 655 N.E.2d at 71.

"Attorney-client relationships have been implied where a person seeks advice or assistance from an attorney, where the advice sought pertains to matters within the attorney's professional competence, and where the attorney gives the desired advice or assistance." *Id*. at 70. An important factor is the potential

client's "subjective belief that he is consulting a lawyer in his professional capacity and his intent to seek professional advice." *Id*. But a potential client's unilateral belief *cannot* create an attorney-client relationship. *Douglas v. Monroe*, 743 N.E.2d 1181, 1185 (Ind. Ct. App. 2001).

### 1. The March 4 engagement was limited in scope and duration.

What occurred between Delamater and Dircks on March 4, 2019, was an emergency intervention that was limited in scope and temporary in duration. No written contract was signed; no fee was charged or paid; no engagement letter was executed; and the parties never even met in person. Indiana Rule of Professional Conduct 1.2(c) expressly authorizes attorneys to limit the scope of their representation, providing: "A lawyer may limit the scope and objectives of the representation if the limitation is reasonable under the circumstances and the client gives informed consent." When an attorney steps into an emergency such as here, where Delamater was called by a third-party attorney to de-escalate an armed standoff, with no retainer, no fee, and an explicit statement the following day that he could not attend the impending hearing, that intervention is limited in scope and duration.[2] *See Flatow v. Ingalls*, 932 N.E.2d 726, 731 (Ind. Ct. App. 2010) (holding that Rule 1.2(c) limits an attorney's duty

---

[2] Comment 3 to Rule of Professional Conduct 1.1 provides that an attorney may give limited advice in an emergency. That comment addresses attorney *competence*, whereas Rule 1.2(c) addresses the *scope* of representation. But both provisions indicate that emergency assistance is meant to be limited. Therefore, interpreting such intervention as giving rise to ongoing representation would contradict both the letter and purpose of these rules.

to the agreed-upon scope of engagement, and that no duty arises for tasks outside that scope).[3]

## 2. The March 5 voicemail confirms that there was no continuing attorney-client relationship.

Delamater's March 5 voicemail does not show that a relationship continued beyond March 4; in fact, it shows the opposite. Delamater told Dircks to attend the March 6 hearing without him, to tell the trial court that Dircks planned to hire counsel, and to call back to schedule an appointment "to go over paperwork." Appellant's App. Vol. III p. 46. Telling Dircks to complete paperwork shows that formal steps to establish representation had not been taken.

Delamater's reference to appearing at a future hearing was not evidence of a continuing engagement. Such a prospective statement about what Delamater *might* do if Dircks retained him does not establish that an ongoing relationship already existed. The voicemail's instructions to attend the March 6 hearing without Delamater and to tell the trial court that Dircks was planning to hire

---

[3] Dircks contends that Delamater's affidavit, in which he denied the existence of an attorney-client relationship, conflicts with Delamater's earlier deposition testimony, in which he stated he had an "ethical duty" to help Dircks. It is well settled that statements in a subsequent affidavit cannot create a genuine issue of material fact by contradicting earlier deposition testimony. *Shorewood Forest*, 237 N.E.3d at 1148. "'Where deposition and affidavit are in conflict, the affidavit is to be disregarded unless it is demonstrable that the statement in the deposition was mistaken, perhaps because the question was phrased in a confusing manner or because a lapse of memory is in the circumstances a plausible explanation for the discrepancy.'" *Id.* (quoting *Crawfordsville Square, LLC v. Monroe Guar. Ins. Co.*, 906 N.E.2d 934, 939 (Ind. Ct. App. 2009)). Here, Delamater's affidavit does not directly conflict with his prior deposition testimony. Delamater's deposition testimony regarding an ethical duty was limited to the context of de-escalating the March 4 emergency, which is the same limited duty described in his affidavit.

counsel simply described the steps necessary to form such a relationship. Indeed, Dircks never went to Delamater's office and never formally retained Delamater. Thus, to the extent that Dircks was Delamater's client, he was a client only for the emergency situation on March 4.

### 3. Statements to third parties did not create an attorney-client relationship.

[31] We acknowledge that Delamater referred to Dircks as his "client" when speaking with the dispatcher and the Sheriff. But the relevant inquiry is whether Delamater's conduct, *directed at Dircks*, created a reasonable basis for Dircks to believe that an ongoing attorney-client relationship had been formed. *See Anonymous*, 655 N.E.2d at 71 (holding that the existence of an attorney-client relationship "is dependent only on the nature of the interaction *between the parties* and their consent, express or implied, to such a relationship.") (emphasis added). Statements made to third parties cannot supply the consent necessary to form such a relationship. At most, Delamater was acting as Dircks' attorney only during the emergency.

[32] Dircks' own declaration to the trial court at the March 6 hearing that Delamater[4] was his attorney is precisely the kind of unilateral belief that cannot establish the consent of the other party. *See Douglas*, 743 N.E.2d at 1186 (noting that a potential client's unilateral belief cannot create an attorney-client

---

[4] In fact, Dircks could not even remember Delamater's name at that hearing and referred to him as "Delamante" or "Delamonte." Appellant's App. Vol. II p. 164.

relationship).  Moreover, Dircks' own expert conceded that Delamater clearly communicated to Dircks that he would not attend the March 6 hearing.  If Dircks' own expert agrees that Delamater affirmatively told Dircks he would not appear at the very hearing at which Dircks claims he was damaged by the absence of counsel, no reasonable trier of fact could conclude that Delamater owed Dircks a duty of representation at that hearing.[5]  Because the designated evidence negates the duty element of Dircks' claim, Defendants were entitled to summary judgment as a matter of law.

## B.  Delamater did not cause Dircks' damages.

[33]     Assuming *arguendo* that a genuine issue of material fact exists as to the existence of an attorney-client relationship and any resulting breach, the designated evidence reveals no genuine factual dispute regarding proximate causation.

> To establish causation and the extent of harm in a legal malpractice case, the client must show that the outcome of the underlying litigation would have been more favorable but for the attorney's negligence.  In other words, the client must prove the lawyer's negligence proximately caused its injury.  This proof generally requires a trial within a trial.  Proximate cause is primarily a question of fact for the jury, but it can be decided as a matter of law if the relevant facts are undisputed and lead to only a single inference or conclusion.

---

[5] We question whether expert testimony was relevant here.  Whether a duty exists is a question of law for the court, not a question of fact for a jury or an expert witness.  *Vaughn v. Daniels Co.*, 841 N.E.2d 1133, 1145 (Ind. 2006); *see also In re Estate of Lee*, 954 N.E.2d 1042, 1046 (Ind. Ct. App. 2011) (noting that experts may not testify as to conclusions of law).  Expert opinion is more properly directed to breach of duty and causation.

*Shorewood Forest*, 237 N.E.3d at 1147 (citation modified). Here, the undisputed facts establish that any damages[6] resulted from an independent chain of events already in motion before Delamater became involved and, more importantly, from Dircks' own conduct afterward.

### 1. DCS's intervention preceded Delamater's involvement.

[34] The procedures that led to the detention of Dircks' children were already in motion well before Delamater made his first phone call. DCS filed a motion for an order to compel entry into Dircks' home at approximately 1:45 p.m. on March 4. Shortly thereafter, the trial court entered an order authorizing entry "by any and all means necessary and appropriate." Appellant's App. Vol. IV p. 60. Delamater did not speak with Dircks until approximately 4:20 p.m., over two hours after the court order was issued. Thus, DCS had already determined that a judicially authorized forced entry into Dircks' home was necessary.

[35] Further, DCS confirmed that it planned to open a CHINS case and that the children would not be permitted to remain in the home that night, well before Delamater and law enforcement had agreed on any plan for Dircks to surrender the children. As Defendants' expert, Attorney Haymaker, correctly noted, Delamater "had no authority to prevent DCS from making a unilateral decision to detain the children." *Id*. at 67. This is not a contested *factual* dispute;

---

[6] Dircks' complaint and appellate briefs are not entirely clear as to what specific claim of damages Dircks is asserting, but the only damages he refers to are the temporary removal of his children.

Haymaker's statement is a correct *legal* observation about the limits of what any attorney could have done under those circumstances.

## 2. Delamater's involvement helped, not harmed, Dircks.

[36] On March 4, the Sheriff's Office had an active court order, a Special Response Team had been deployed, and sniper positions had been scouted. Delamater, nonetheless, negotiated a peaceful resolution to that tense situation, and the children were initially placed with family rather than strangers in foster care. Without Delamater's intervention, the situation would almost certainly have ended worse for Dircks.

## 3. Dircks' own conduct was the proximate cause of his damages.

[37] Setting aside the March 4 events, the undisputed facts concerning the March 6 hearing clearly establish that Dircks, not Delamater, caused any resulting damages. At the close of that hearing, the trial court granted Dircks informal visitation at the Crocketts' home, conditioned on the children's paternal grandmother, Shirley, being present. The trial court's order explicitly informed Dircks that he could visit the children that afternoon so long as Shirley was present. Nevertheless, Dircks went to the Crocketts' home while Shirley was completing her DCS background check and visited the children without her, which was a direct violation of the trial court's order. The trial court held an emergency hearing that same afternoon, revoked the informal visitation arrangement, and ordered the children to be placed in foster care with Dircks' visitation fully supervised.

Dircks' violation of the trial court's unambiguous order was an intervening cause of Dircks' alleged damages. Ferguson's opinion that the presence of counsel could have "thwarted" this violation through the advice of counsel is mere speculation. Appellant's App. Vol. VIII p. 116. The trial court's order was unambiguous; Ferguson herself agreed at deposition that the trial court's instructions were not confusing, and she agreed that the reason the children were placed in foster care was that Dircks violated the order. Nothing in the record suggests that Delamater would have somehow convinced Dircks to wait for Shirley to complete her background check before visiting the children. Dircks' own choice, and not anything Delamater did or failed to do, caused the trial court to place the children in foster care.

### 4. Ferguson's supplemental opinion does not establish a genuine issue of material fact regarding causation.

Causation in a legal malpractice case generally requires a "trial within a trial." *Shorewood Forest*, 237 N.E.3d at 1147. Ferguson's supplemental opinion that "it is more probable than not that if Mr. Delamater had utilized varying legal strategies that are typically utilized in that situation, the outcome would have been different," Appellant's App. Vol. VIII p. 113, was a generic assertion that different lawyering might have produced a different result. It is not a reconstruction of what would have happened at the March 6 detention hearing

had Delamater appeared. Nor does it adequately account for the constraints of an emergency CHINS detention proceeding.[7]

[40] The designated evidence gives rise to a single inference: Delamater's actions helped Dircks and Delamater's non-appearance at the March 6 hearing was not the proximate cause of Dircks' claimed injuries. Thus, the trial court properly granted summary judgment in favor of Defendants.

## Conclusion

[41] The designated evidence shows that there was no continuing attorney-client relationship between Dircks and Delamater beyond the March 4 incident. Even if there were, the designated evidence clearly shows that Delamater did not cause Dircks' alleged damages. We, therefore, affirm the trial court's grant of summary judgment in favor of Defendants.

[42] Affirmed.

Bailey, J., concurs.

Kenworthy, J., dissents with separate opinion.

---

[7] Ferguson's opinion that Delamater worsened the situation by disclosing his concerns about Dircks' mental state to law enforcement is a breach argument, not a causation argument. Moreover, the original DCS hotline report, which was made well before Delamater was contacted, already documented that Dircks was "very paranoid" and "delusional," that there was "small artillery" in the home, and that the family slept in armed shifts. Appellant's App. Vol. II p. 35. DCS did not need Delamater's opinions to come to its own conclusions about Dircks' mental state.

APPELLANT PRO SE

Barry Dircks
Lebanon, Indiana


ATTORNEY FOR APPELLEES

Vincent P. Antaki
Reminger Co., LPA
Indianapolis, Indiana


**Kenworthy, Judge, dissenting.**

Under our well-settled summary judgment standard of review, "Indiana consciously errs on the side of letting marginal cases proceed to trial on the merits, rather than risk short-circuiting meritorious claims." *Hughley v. State*, 15 N.E.3d 1000, 1004 (Ind. 2014). Because I believe the designated evidence shows genuine issues of material fact exist on each element of Dircks' legal malpractice claim, I would hold the trial court erred in granting summary judgment for Defendants and would remand for further proceedings. I therefore respectfully dissent.

## 1. Existence of an attorney-client relationship creating a duty

"The existence of a duty is generally a question of law for the court to decide." *In re Estate of Lee*, 954 N.E.2d 1042, 1046–47 (Ind. Ct. App. 2011), *trans. denied*. But whether an implied attorney-client relationship has formed may also be a factual question which turns on the facts and circumstances of the parties' dealings. *See, e.g., Rice v. Strunk*, 670 N.E.2d 1280, 1288 (Ind. 1996)

(considering whether evidence of an attorney's dealings with a putative client created a genuine issue of material fact).

[45] The majority concludes that if any attorney-client relationship existed, it was of limited scope and duration, forming when Delamater intervened during the events of March 4 and ceasing when the emergency ended. I agree a genuine factual dispute exists as to whether an implied attorney-client relationship formed on March 4. Overall, the designated evidence tends to show Dircks sought an attorney's advice for help with a legal situation. Delamater answered that call, held himself out to third parties as Dircks' attorney,[8] and acted as Dircks' attorney to negotiate with BCSO and DCS on Dircks' behalf during the March 4 events.

[46] If the designated evidence showed Delamater's involvement ended that night and he thereafter unequivocally dispelled any notion Dircks might have about continuing legal representation, I would agree with the majority that any such relationship concluded along with the emergency. But what happened in the following two days is a matter of dispute, and I believe the facts give rise to reasonable, conflicting inferences about the parties' consent to an ongoing attorney-client relationship.

[47] Defendants' designated evidence shows that on March 5, the day after the stand-off, Delamater called Dircks and left a voicemail relaying information

---

[8] Although Delamater's representations to third parties are not conclusive as to the parties' relationship, Delamater's repeated references to his "client" are at least indicative of Delamater's consent.

about the March 6 hearing. Delamater clearly informed Dircks he could not attend the hearing due to a conflict. According to Delamater's affidavit, "I [Delamater] informed Mr. Dircks that I would not be able to help him" and "[w]e never discussed fees nor ongoing legal needs, other than for me to provide him several referrals for attorneys who may be able to assist him." *Appellant's App. Vol. 2* at 117. Delamater also averred: "I do not recall directing an employee of [the Firm] to contact Mr. Dircks to schedule a meeting with me. I recall learning of a call being made in error, so I explained that I did not want our firm performing any services for Mr. Dircks." *Id*.

[48] In his response and cross-motion for summary judgment, Dircks designated a recording of the voicemail Delamater left him on March 5. In it, Delamater advises Dircks to attend the hearing, tell the court he is hiring counsel, and request another hearing date "so that **I** can appear with you." *Ex. 12* at 0:23 (emphasis added). Delamater himself instructs Dircks to call and speak to the Firm's assistant to set up an appointment to review paperwork. Dircks designated a second voicemail recording from March 5 in which the assistant leaves Dircks a message about scheduling an appointment with Delamater. Also among Dircks' designated evidence is Delamater's deposition testimony, in which Delamater stated there were situations in which he would advise a client to attend a hearing without an attorney and that "has been something that I've advised." *Appellant's App. Vol. 5* at 189–90. On March 6, Dircks advised the trial court at the outset of the hearing that he had an attorney who couldn't appear due to a conflict. Dircks also designated evidence suggesting it

was not until March 7, the day after the hearing, that Delamater attempted to refer Dircks' case to a fellow attorney by sending the following text message: "I have a referral for family law. Anyone at your firm ready for a crazy client with lots of money to spend?" *Id.* at 80.

[49] Based on this evidence, the majority concludes there was no continuing attorney-client relationship because Dircks took no formal steps to establish a formal or express relationship after the emergency ended. True, there is no evidence Dircks spoke to Delamater or completed any paperwork with the Firm after March 4. But at the March 6 hearing, Dircks informed the trial court he had a private attorney and gave Delamater's name, or some version of it. (Dircks stumbled over the pronunciation, but there is no genuine dispute he was referring to Delamater.) This evidence tends to suggest Dircks subjectively believed Delamater was his attorney as of March 6, even though Delamater did not attend the hearing. *See In re Anonymous*, 655 N.E.2d 67, 70 (Ind. 1995) (noting an "important factor" in determining whether an implied relationship exists is "the putative client's subjective belief that he is consulting a lawyer in his professional capacity and on his intent to seek professional advice").

[50] Of course, Dircks' unilateral belief is not enough to establish an attorney-client relationship, *Douglas v. Monroe*, 743 N.E.2d 1181, 1185 (Ind. Ct. App. 2001), so the pertinent question is what Delamater's conduct implied. The majority concludes the March 5 voicemail establishes as a matter of law that Delamater did not consent to an attorney-client relationship because he clearly communicated he would not attend the hearing on Dircks' behalf. Yet

Delamater's voicemail does not affirmatively state he will **not** represent Dircks. Delamater informs Dircks he should attend the March 6 hearing on his own and ask for a continuance so **Delamater** can appear with him later. In the message, Delamater invites Dircks to complete paperwork, which could reasonably be understood as explaining how to formalize a relationship that began on March 4. And Delamater did **not** advise Dircks to seek different counsel to represent him at the March 6 hearing. In both content *and tone*, the message communicates Delamater's willingness to continue to represent Dircks in proceedings stemming from the events of March 4. And critically, Delamater stated in his deposition that he would—and has—advised clients to attend hearings without him in certain situations where he did not believe an attorney's presence would affect the outcome. In other words, by his own admission, the fact Delamater did not attend the March 6 hearing is not conclusive evidence of his lack of consent to an attorney-client relationship with Dircks. Dircks then followed Delamater's advice the next day when he went to the hearing and informed the court Delamater was his attorney.

[51] In the context of evaluating whether an implied attorney-client relationship exists, one factor is whether the attorney should have been aware the client thought the attorney was representing him and acted to dispel the client's belief. *See Anonymous*, 655 N.E.2d at 70–71 (holding there was evidence tending to establish both parties consented to an attorney-client relationship where the attorney provided advice to the client regarding matters within his professional competence, the client thought the attorney was acting as his counsel, the

attorney should have been aware the client thought the attorney was representing him, and the attorney "did nothing to dispel this belief"); *Hacker v. Holland*, 570 N.E.2d 951, 956 (Ind. Ct. App. 1991) ("An attorney has in effect consented to the establishment of an attorney-client relationship if there is proof of detrimental reliance, when the person seeking legal services reasonably relies on the attorney to provide them and the attorney, aware of such reliance, does nothing to negate it.") (internal quotation and citation omitted), *trans. denied*.

[52]    Delamater designated evidence showing he did not consent to an attorney-client relationship. Dircks came forward with conflicting evidence and facts which support a reasonable inference of the opposite. On summary judgment, we resolve all factual inferences and all doubts as to the existence of a material issue in favor of the nonmovant. *Zaragoza v. Wexford of Ind., LLC*, 225 N.E.3d 146, 151 (Ind. 2024). And because the determination of whether an attorney-client relationship existed in this case requires a factfinder "to resolve the parties' differing accounts of the truth," *Hughley*, 15 N.E.3d at 1003, I would hold summary judgment is inappropriate on the issue of whether such a relationship formed and Delamater owed Dircks a duty of care.

## 2. Breach

[53]    The majority opinion does not discuss breach, but I address it briefly because I believe genuine issues of material fact exist on this element as well. A lawyer owes a client a general duty to exercise ordinary skill and knowledge. *Estate of Lee*, 954 N.E.2d at 1047 (citing *Rice*, 670 N.E.2d at 1283–84). "Whether a particular act or omission amounts to a breach of an attorney's duty is generally

a question of fact for the jury." *Id.* "To prove legal malpractice, expert testimony is normally required to demonstrate the standard of care by which the defendant attorney's conduct is measured." *Hacker*, 570 N.E.2d at 953.

[54] In support of their summary judgment motion, Defendants argued there was no evidence to show Delamater breached the standard of care in his interactions with Dircks and designated an expert opinion concluding as much. In response, Dircks designated the expert opinion of attorney Dorothy Ferguson which points to several acts and omissions of Delamater's which she believed fell below the standard of care. As to March 4, these acts or omissions include: Delamater's failure to request documentation to support the assertions of law enforcement and DCS (i.e. failure to review the court's order); his repeated assertions to law enforcement that Dircks was "not stable" or "not in the right state of mind" *Ex. 3* at 3:55, 4:37; and Delamater's advice that Dircks follow the sheriff's plan to send the children out of the home, rather than follow the court's order. As to March 6, Ferguson believed Delamater had a duty to either clearly inform Dircks he did not plan to represent Dircks, to attend the hearing with Dircks, or to have another attorney cover the hearing for him. According to Ferguson, this failure was a breach of an attorney's duty to a client in a child neglect case.

[55] Generally, conflicting expert reports are sufficient to defeat summary judgment. *Cf. Siner v. Kindred Hosp. Ltd. P'ship*, 51 N.E.3d 1184, 1190 (Ind. 2016) (observing, in the context of medical malpractice cases, "expert opinions which conflict on ultimate issues necessarily defeat summary judgment").

Considering these dueling opinions, I would hold genuine issues of material fact exist as to whether any of Delamater's acts or omissions fell below the standard of care appropriate to the circumstances.

### 3. Proximate causation

As summary judgment movants, Defendants were required to negate the causation element of Dircks' legal malpractice claim. *Roumbos v. Vazanellis*, 95 N.E.3d 63, 64 (Ind. 2018). In other words, to be entitled to summary judgment on this element, Defendants must establish as a matter of law Delamater was **not** a proximate cause of Dircks' claimed injury (the detention of his children). Only if Defendants could meet this burden would it then shift to Dircks. To survive summary judgment, Dircks was only required to show a conflict in the evidence related to proximate cause, not affirmatively prove his case. *See Siner*, 51 N.E.3d at 1189 (noting that on summary judgment, evidence "sufficient to support a verdict is not required") (citation omitted). I believe Dircks has carried his burden to avoid summary judgment on this issue.

As to the March 4 events, the majority concludes the undisputed facts and inferences therefrom establish as a matter of law Delamater's acts or omissions could not have been a proximate cause of the children's detention. In support, the majority points to (1) the "independent chain of events already in motion before Delamater became involved," *slip op.* at ¶33, and (2) the fact Delamater had no authority to prevent DCS from unilaterally deciding to detain the children. The majority concludes the only reasonable inference from the facts is that Delamater helped, not harmed, Dircks, and absent the attorney's

involvement, the situation would "almost certainly" have ended worse for Dircks. *Id*. at ¶36.

[58] I might be inclined to agree with the majority if DCS was legally required to detain the children on March 4 or had decided to detain the children before Delamater got involved. *See, e.g., Shorewood Forest Utils., Inc. v. Welsh*, 237 N.E.3d 1142, 1149 (Ind. Ct. App. 2024) (holding summary judgment was appropriate in a legal malpractice claim on the issue of proximate cause where the undisputed designated evidence indicated there was nothing the attorney did or did not do that influenced the client's decision to rescind a contract as the client did not ask the attorney for legal advice regarding the contract recission). Under those circumstances, there would be no basis on which a factfinder could conclude Delamater was a proximate cause of Dircks' injury. But that is not the case.

[59] According to the designated evidence, the March 4 incident began when DCS attempted to conduct a welfare check in the morning. Around 2:00 p.m., the Boone Circuit Court ordered the Dirckses to allow BCSO and DCS family case managers to enter the home and property by any means necessary to conduct a welfare and safety check. Delamater became involved around 4:20 p.m. when he called and spoke to Dircks then contacted dispatch. Dircks designated recordings of the phone calls between Delamater and law enforcement. During the initial call with Delamater, BCSO and DCS are focused on completing the welfare check. In a later call, Sheriff Nielsen informs Delamater that a DCS supervisor has decided to detain the children. *See Ex. 9* at 3:37:40–3:38:32.

DCS's assessment report states that "at approximately 6:30pm, the decision was made to detain the children[.]" *Appellant's App. Vol. 4* at 118.

[60] The court order on March 4 was not a detention order. Under our Child in Need of Services ("CHINS") statutes, there are certain circumstances under which law enforcement or a DCS caseworker may take a child into custody absent a court order. *See, e.g.,* Ind. Code § 31-34-2-3. As Defendants' expert noted, Delamater had no authority to prevent DCS from deciding to detain the children that evening. But neither was DCS **required** to detain them. The designated evidence strongly suggests DCS made this discretionary decision after Delamater got involved. So, this is not a case in which the outcome was determined as a matter of law or an attorney's intervention could not have led to a different result. *See Shorewood*, 237 N.E.3d at 1149.

[61] As to whether Delamater's acts or omissions on March 4 were a proximate cause of the children's removal, "[t]here can be multiple proximate causes of a resulting event*." Funston v. Sch. Town of Munster*, 849 N.E.2d 595, 600 (Ind. 2006). A defendant's act need not be the sole cause of the plaintiff's injuries. *Hamilton v. Ashton*, 846 N.E.2d 309, 316 (Ind. Ct. App. 2006), *trans. denied*. "Many causes may produce the injurious result; the essential question is whether the defendant's wrongful act is one of the proximate causes rather than a remote cause." *Id*. In her supplemental report, Ferguson concluded Delamater's acts and omissions were a proximate cause of Dircks' injury. She noted Delamater repeatedly told law enforcement Dircks had mental health problems and advised Dircks to follow BCSO's plan to send the children out of

the house rather than follow the court order to permit entry. In her opinion, these actions exacerbated, rather than diffused, the situation and influenced DCS's decision to detain the children. Ferguson's opinion does not establish Delamater's alleged negligence was a proximate cause of Dirck's claimed injury, but it does create a genuine issue of material fact on the issue.

[62] Still, the majority dismisses Ferguson's supplemental opinion as "a generic assertion that different lawyering might have produced a different result" and therefore inadequate to create a genuine issue of material fact. *Slip op.* at ¶39.

[63] First, I note that Defendants only briefly argued the trial court should disregard Ferguson's opinion for containing "speculation, supposition[,] and conjecture" in their reply brief in support of summary judgment. *Appellant's App. Vol. 9* at 109. They do not raise this argument on appeal. Because Defendants have not attacked the adequacy of Ferguson's expert opinion in this Court, I see no need to do so.

[64] Regardless, I believe the substance of the report goes beyond mere speculation. It is apparent Ferguson reviewed the materials relevant to Dircks' specific claim and was not merely speculating on hypothetical situations. *See, e.g., Barkal v. Gouveia & Assocs.*, 65 N.E.3d 1114, 1121 (Ind. Ct. App. 2016) (holding attorneys who had not reviewed materials relevant to clients' case and only testified in "general terms and answered multiple speculative hypotheticals" had not provided expert testimony in support of a legal malpractice claim). And the expert opinion goes beyond mere criticism of Delamater's tactics and strategies; Ferguson concludes that but for specific acts or omissions, the outcome of the

March 4 events would have been different. *See, e.g., Gates v. O'Connor*, 111 N.E.3d 215, 231 (Ind. Ct. App. 2018) (in a legal malpractice claim, holding an expert's opinion which criticizes an attorney's tactics, but stops short of stating that but for the attorney's inadequate strategy the outcome would have been more favorable to the client, is inadequate to establish a genuine issue of material fact as to proximate cause), *trans. denied*. Ferguson's opinion may not be convincing to the majority, but it is sufficient to create a genuine issue of material fact on proximate cause. *See Siner*, 51 N.E.3d at 1190 ("[D]efeating summary judgment requires only a genuine issue of material fact, not necessarily a persuasive issue of material fact.").

[65] As to the children's continued detention on March 6, the majority concludes Delamater's non-appearance at the hearing was not the proximate cause of Dircks' injury due to Dircks' own actions violating the trial court's visitation order immediately after the hearing.

[66] If a child is taken into custody under our CHINS statutes and not released, a trial court must hold a detention hearing within forty-eight hours. I.C. § 31-34-5-1. At the hearing, the court must make findings and conclusions as to whether the detention was authorized. I.C. § 31-34-5-2. After the hearing, the trial court "shall release the child to the child's parent," although the court may order the child detained if the court finds probable cause to believe the child is CHINS and other factors apply. I.C. § 31-34-5-3. Under our statutes, the continued detention of the children in this case was not statutorily required. So again, this is not a case with a predetermined legal outcome.

[67] In her report, Ferguson stated she believed Delamater's failure to attend the March 6 hearing was a proximate cause of the children's continued detention. She observed that parents have a statutory right to be heard and make recommendations to the court at a CHINS detention hearing. *See Appellant's App. Vol. 8* at 115–16 (citing I.C. § 31-34-5-1). Yet Delamater appeared to be unaware of this right, having stated in his deposition "[t]here's nothing that the responding party can effectively do at that first detention hearing with or without counsel." *Appellant's App. Vol. 5* at 152. According to Ferguson, an attorney could have presented evidence, cross-examined witnesses, and argued persuasively on Dircks' behalf concerning the continued detention of the children. Without an attorney present, Dircks barely spoke. At the outset of the hearing, he informed the CHINS court his attorney "didn't want [him] to say anything," to which the court responded, "I wouldn't let you." *Appellant's App. Vol. 2* at 163–64. And when asked if he had anything to add about the detention, Dircks said he would "rather be quiet." *Id*. at 180. As a result, the CHINS court ordered the continued detention on the testimony of the DCS supervisor and without a full account of the facts and circumstances of the previous days' events. Ferguson concluded the result of the detention hearing would have been more favorable with an attorney's involvement, as Dircks in fact had no mental health issues, the home environment was suitable, the children were returned to Dircks' care a week later, and DCS voluntarily moved to dismiss the CHINS petitions. Again, I believe this opinion was sufficient to create a genuine issue of material fact.

In sum, neither the March 4 emergency nor the March 6 hearing were situations in which the outcomes were legal certainties or an attorney could have no influence. And the parties designated conflicting expert opinions on whether Delamater's acts or omissions were a proximate cause of the children's initial and continued detention. Dircks may have a very steep hill to climb to prove proximate cause. But at this stage of the litigation, to declare as an indisputable factual inference that there was nothing Delamater did (or did not do) that led to the children's initial or continuing detention deprives Dircks of the opportunity to demonstrate to a jury that such acts or omissions amounted to negligence.

## Conclusion

As our Supreme Court has observed, "sometimes standards of review decide cases." *Robinson v. State*, 5 N.E.3d 362, 363 (Ind. 2014). Summary judgment is "rarely appropriate in negligence cases because they are particularly fact-sensitive and are governed by a standard of the objective reasonable person, which is best applied by a jury after hearing all the evidence." *Kramer v. Cath. Charities of Diocese of Fort Wayne-South Bend, Inc.*, 32 N.E.3d 227, 231 (Ind. 2015). Based on my review of the evidence, there are genuine issues of material fact concerning the existence, scope, and duration of an implied attorney-client relationship, breach of any duty owed, and proximate causation. The conflicting facts and reasonable inferences therefrom must be resolved by the trier of fact. Because I believe these issues preclude the entry of summary judgment for Defendants, I respectfully dissent.